### WESTERN UNION TELEGRAPH CO. v. GLENN.

(Court of Civil Appeals of Texas. Amarillo. Jan. 8, 1913. Rehearing Denied May 17, 1913.)

1. TELEGRAPHS AND TELEPHONES (§ 66*) — DELAY IN DELIVERY OF MESSAGES—NEGLIGENCE—EVIDENCE.

In an action for delay in the delivery of a message, evidence *held* to support a finding that the delay was caused by the negligence of the company and not by act of God.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 61–63; Dec. Dig. § 66.*]

2. APPEAL AND ERROR (§ 934*)—EVIDENCE—SUFFICIENCY—REVIEW.

The court on appeal from a judgment for plaintiff will view the evidence in the light most favorable to the judgment when considering the sufficiency of the evidence to support it.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 3777–3781, 3782; Dec. Dig. § 934.*]

3. TELEGRAPHS AND TELEPHONES (§§ 50, 66*) —DELAY IN DELIVERY OF MESSAGES—NEGLIGENCE.

The failure of a telegraph company to deliver a message received for transmission at Santo, Tex., at 8 p. m. January 14th to Clairemont, Tex., until 11 a. m. January 16th, establishes a prima facie case of negligence, and the company has the burden to show some cause excusing it, and a mere claim that the delay was caused by a wire being down, with no excuse for such condition, does not excuse the delay.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 33, 61–63; Dec. Dig. §§ 50, 66.*]

4. TELEGRAPHS AND TELEPHONES (§ 66*) — DELAY IN DELIVERY OF MESSAGES—LIABILITY—EVIDENCE.

In an action for delay in the delivery of a message announcing the death of plaintiff's brother-in-law, thereby depriving plaintiff and his wife of the opportunity of attending the funeral, evidence *held* to justify a finding that if the message had been promptly delivered they would have attended the funeral, authorizing a recovery.

[Ed. Note.—For other cases, see Telegraphs and Telephones, Cent. Dig. §§ 61–63; Dec. Dig. § 66.*]

---

*For other cases see same topic and section NUMBER in Dec. Dig. & Am. Dig. Key-No. Series & Rep'r Indexes

Appeal from District Court, Kent County; Jno. B. Thomas, Judge.

Action by B. L. Glenn against the Western Union Telegraph Company. From a judgment for plaintiff, defendant appeals. Affirmed.

Ed. J. Hamner, of Sweetwater (Geo. H. Fearons, of New York City, of counsel), for appellant. Higgins, Hamilton & Taylor, of Snyder, and W. P. Blackburn, of Clairemont, for appellee.

HUFF, C. J. B. L. Glenn, appellee, brought suit against the appellant, Western Union Telegraph Company, alleging that appellant failed to use ordinary diligence in the delivery of a message, announcing the death of the brother of appellee's wife, in time for her to attend the funeral service and burial of her brother, which it is alleged she could and would have done. The appellant answered by general denial and, among other pleas, alleges that from and after "5 o'clock p. m., January 14, 1912, and until 10:30 o'clock a. m. January 16, 1912, by reason of a storm and high winds and atmospheric influences over which defendant had no control, the wires of this defendant, over which telegrams had to be transmitted, to Jayton, Tex., were down, and telegrams could not be dispatched over them. * * * That it used more than usual and ordinary diligence in the endeavor to deliver the telegram in question, but was prevented by the act of God, over which it had no control, and therefore relieved of liability in law." Appellant does not plead a contract limiting its liability. R. C. Stewart died at Santo, January 14, 1912, at about 5 o'clock p. m., and T. W. Stewart sent to appellee, B. L. Glenn, the following telegram: "Santo, Texas, 1/14/1912. To B. L. Glenn, Clairemont, Texas. Richard died five o'clock this p. m. T. W. Stewart." Time filed 5:28 p. m. R. C. Stewart was the son of T. W. Stewart and brother of Mrs. Ora L. Glenn, the wife of appellee, and was known and called Richard. The agent of appellant at Santo knew and was well acquainted with the deceased, his father and sister, Mrs. Glenn, as well as her husband, at the time of filing the telegram in the Santo office. The appellant had a telegraph wire from Santo to Jayton in Kent county, which was about 15 miles from Clairemont in that county, at which last place appellee and his wife resided. The wife was postmistress at that place, and appellee, her husband, was county judge of the county and had a drug store in the town. There was a telephone from Jayton to Clairemont. In sending the telegram from Santo to Jayton, the testimony of the agent and others shows that appellant through its agent agreed to have the message communicated over the telephone from Jayton to appellee at Clairemont. There were no charges for such services, as the telephone could be used free by those having boxes in their places of business, which appellee had at that time and which method of communication the agents of appellant had theretofore used. In sending the message it was first to send to Dallas, a relay office, and from there send to Wichita Falls and relay from there to Jayton. The ordinary or usual time for transmitting the message is shown to have been from one hour to two hours. If it had been sent in the usual time, appellee should have received the message by not later than 8 o'clock p. m. January 14, 1912. The evidence shows the message did not arrive at Jayton until after 11 o'clock a. m., January 16, 1912. The funeral of the brother was had about 4 or 5 o'clock January 15, 1912, at Santo. The evidence further shows that Mrs. Glenn, in December, 1911, was called to the bedside of her brother, where she remained for some days until she was required to return to her children and on account of her duties in the post office, but before leaving Santo she made arrangements with her father to send a telegram in case of her brother's death, as she desired to attend the funeral. This the father promised and sent the message in compliance with his agreement to do so, paying the charges in full as agent for appellee. In order to reach Santo from Clairemont, the usual and customary way is to go by private conveyance through the country from Clairemont to Jayton—15 miles—and at that point take the Wichita Valley Railroad to Stamford, and there take the Texas Central to Cisco, and there take the Texas & Pacific to Santo. The Wichita Valley left Jayton going east to Stamford at 2:30 or 3 o'clock p. m. on the date of the telegram. There was only one train a day each way at that time over that road. Mrs. Glenn could not have gone by Jayton and the Wichita Valley, the usual route, had she received the message on the 14th, either at 7 or 8 o'clock p. m. of that day in time to have attended the funeral of her brother on the 15th at 4 or 5 o'clock p. m. The other route was to go to Rotan from Clairemont, a distance of some 35 miles, and there take the Texas Central to Cisco and then via the Texas & Pacific Railway to Santo. The evidence does not show any train leaving Rotan which she could have taken and which would have connected with the Texas & Pacific in time to have reached the funeral. The next route would have been to go from Clairemont via Rotan on to Sweetwater, situated on the Texas & Pacific, a distance placed with the witnesses from 70 to 77 miles. The evidence shows there were three or four trains passing through Sweetwater going east on the Texas & Pacific Railway, passing Santo; one passing Sweetwater at 9 o'clock at night, one at 11:15 at night, one at 8 o'clock in the morning, and one at 10:40 a. m. This last train the testimony shows did not stop at Santo. The

testimony further shows that one train passed Santo at 4 a. m., one at 2:20 p. m., and one at 4:20 p. m. on the 15th day of January, 1912.

[1] The record before us shows that the only train which Mrs. Glenn could have taken to reach Santo in time for the funeral was the one passing Sweetwater January 15, 1912, at 8 o'clock a. m. Both Mrs. Glenn and her husband, B. L. Glenn, testified that she could and would have attended the funeral had the message been received on time. The testimony shows that both were expecting the message and had perfected all arrangements for Mrs. Glenn to make the trip. Mrs. Glenn had arranged to have the post office properly cared for during her absence and for a lady to care for her children during that time. Her husband had a team ready so that he could start at once upon receipt of the telegram. It further shows that they then proposed to go to Jayton if the conditions were so they could go that route; if not, then they expected to go by Rotan and take the train at that point. The attorneys contend, and in so far as the record shows in this case seem to indicate, that the train appellee was expecting to take at Rotan had been annulled or discontinued; but that fact was not then known to appellee. He, upon the trial, says, however, he would have gone to Sweetwater; that he would have driven to Rotan with his team and buggy and there obtained another team and proceeded to Sweetwater and could and would have arrived at Sweetwater in time to have taken the 8 o'clock train. There was a livery stable at Rotan where he could have obtained a team, and that he certainly would have taken his wife to the train in time for the funeral. He would have had about 12 hours in which to make the trip from Clairemont to Sweetwater. The evidence shows there was some rough road and some sand and that it would have been a difficult and hard trip in the night. There is some testimony that he could have gone through in an automobile, but the evidence shows appellee did not own one, and that there was no garage at Clairemont, and that none were for hire at that place. There was telephone communication between Clairemont and Rotan and between Rotan and Sweetwater and Clairemont and Sweetwater. The testimony of McKnight, the agent of appellant at Jayton, is to the effect that after 5:30 p. m., January 14, 1912, the wires were down, somewhere east of Jayton, and that he supposed they were broken or disconnected, and another agent at Wichita Falls testified to the same effect. There is no evidence showing where the wire was broken or disconnected or how the same was so broken or disconnected. There is no evidence of any storm or high winds which caused the break or of any natural force over which appellant had no control, which caused it. The parties repairing it, if it was repaired, did not testify and there is nothing in the record showing any such break except the two agents, who testified to certain tests made by them of the wires from their respective offices and so ascertaining the break or disconnection. The message in question was received at Jayton January 16, 1912, a little after 11 o'clock a. m., and was by the agent at that point immediately phoned over to Mrs. Glenn at Clairemont. Appellee Glenn testified that on the 16th of January he went to Jayton on business and while there the agent handed him the message and upon his inquiring of the agent, McKnight, what had caused the delay, the agent replied he hardly knew why it was. He could give no definite answer why. "He made a remark about delivering the message upon receipt there, but as to why it did not reach his office earlier he did not know positively. I asked him if he was using the wires, and he said they were. He stated at the time that the wires had been very busy in heavy use and demand from the railroad operators at Spur, through here."

The case was tried before the judge of the court below without the intervention of a jury. Upon the above facts he rendered judgment for $600 for appellee, against appellant. It is insisted that the court was in error in rendering judgment against appellant for the reason that the evidence shows the wires were down at the time the message was received for transmission. It will be noted that the message was received at the Santo office at 5:28 p. m., and McKnight says he found the wires were down at 5:30 p. m., two minutes after the reception at Santo. Appellant does not show where they were down, or the extent of the injury. This was clearly within the province and power of appellant to have shown if such was their condition. Appellee shows on the day the message was received at Jayton the witness did not claim the cause of the delay to have been from the fact that the wires were down, but attributed it to the heavy use of the wires by the railroad employés, and asserted the wires were then in use. This witness does not deny that he had the conversation with appellee, but says he does not recollect just what was said. We think there was testimony from which the court could have found the delay was not caused by the wires being down and that they in fact were not down as asserted by appellant.

[2] The evidence should be viewed in the light most favorable to the judgment, and in doing so we must conclude the appellant was negligent in the transmission of the message and that its wires were not down. If they were down, there is nothing to show they were so by the act of God or any force over which appellant had no control. If they were in fact down, there is nothing showing that they were not so from the negligence of appellant.

[3] The failure to deliver the message as

set out in this case made a prima facie case of negligence, and the burden rested on appellant to show some cause excusing it. The mere claim that the delay was caused by the wire being down, with no excuse offered for this condition, we think will not excuse the delay from 8 o'clock p. m. January 14th to 11 o'clock a. m. January 16th. W. U. Tel. Co. v. Bouchell, 28 Tex. Civ. App. 23, 67 S. W. 159; W. U. Tel. Co. v. Sheffield, 71 Tex. 570, 10 S. W. 752, 10 Am. St. Rep. 790; W. U. Tel. Co. v. Shaw, 33 Tex. Civ. App. 395, 77 S. W. 433. It should be stated that appellee's initials are B. L.; that the message filed with the agent at Santo was addressed to B. L. Glenn. When received at Jayton the address was changed from B. L. to R. B. The facts show that appellee was known at Jayton by the agent at that point, and that appellee received freight from the railroad office where the agent was at work, and that he transacted business with the agent. The facts further show that the message was phoned over to Clairemont to Mrs. R. B. Glenn. The change in the address may have contributed to the delay. It was at least calculated to do so. While the agent testifies that he did not receive it at Jayton until the 16th and that he phoned it to Mrs. Glenn at once, the trial court does not appear to have placed much faith in his testimony, and we might conclude that this change in the initials was found by the trial court to have occasioned the delay and that appellant was negligent in so transmitting the message. W. U. Tel. Co. v. Hines, 22 Tex. Civ. App. 315, 54 S. W. 627; W. U. Tel. Co. v. Tobin, 56 S. W. 540.

[4] It is strenuously urged that there was no evidence in the case from which the trial court could have found that appellees could and would have arrived in time for the funeral of her brother had the message been delivered to appellee at the time it should have been by the exercise of ordinary diligence. This question we must confess has given us considerable trouble to resolve in favor of the court's judgment. However, taking into consideration the anxiety of the sister to be at the funeral of her brother, the fact that she had been with him for several days during his last illness and only left him to return to her children, and the care she had taken to have an immediate message sent to her in case of his death, and the promise which she exacted to do so, together with the fact that she and her husband were expecting a message and made every preparation for her to make the trip, we think must have had great weight, and properly so, with the trial judge in concluding that the appellee not only would but could have made the trip in time. The journey across from Clairemont to Sweetwater is shown to have been a difficult and hard one and that perhaps at the time that partic-ular trip was not in contemplation of the appellee. However, we are not prepared to say as a matter of law that there was no testimony authorizing the trial judge to find that appellee and wife would and could have made the trip. We think there are facts and evidence which support the judgment. From reading the record, we might be impressed at this distance that such a trip was improbable. We do not think, however, we ought to say as a matter of law the court had no fact upon which his judgment could be rendered. He saw and heard the witnesses and could better than we form a correct conclusion as to the conditions, probabilities, and improbabilities.

We find no such error in the case as will warrant us in reversing the judgment of the trial court, and it is therefore affirmed.